1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Daniel J. Weintraub - Bar #132111**
**James R. Selth – Bar #123420**
**Summer Saad – Bar #250337**
**WEINTRAUB & SELTH, APC**
**12121 Wilshire Boulevard, Suite 1300**
**Los Angeles, CA 90025**
**Telephone: (310) 207-1494**
**Facsimile: (310) 442-0660**

Attorneys for Chapter 11 Debtor and Plan Proponent

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>TEMIDAYO AKINYEMI,<br><br>Debtor and Debtor in Possession. | ) Case No. 2:09-bk-17862-EC<br>)<br>) Chapter 11 Case<br>)<br>) **DISCLOSURE STATEMENT**<br>) **DESCRIBING CHAPTER 11 PLAN**<br>) **OF REORGANIZATION OF**<br>) **TEMIDAYO AKINYEMI**<br>)<br>) **Disclosure Statement Hearing:**<br>) Date:<br>) Time:<br>) Place: Courtroom "1639"<br>)        255 E. Temple St.<br>)        Los Angeles, California 90012<br>)<br>) **Plan Confirmation Hearing:**<br>) Date:<br>) Time:<br>) Place: Courtroom "1639"<br>)        255 E. Temple St.<br>)        Los Angeles, California 90012<br>)<br>)<br>)<br>)<br>)<br>) |

1

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................. 2
      A.    Purpose of This Document ......................................... 4
      B.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing ... 5
            1.    Time and Place of the Confirmation Hearing ......................... 5
            2.    Deadline For Voting For or Against the Plan ......................... 5
            3.    Deadline For Objecting to the Confirmation of the Plan ............. 6
            4.    Identity of Person to Contact for More Information Regarding
                  the Plan ...................................................... 6
      C.    Disclaimer ....................................................... 6
II.   BACKGROUND ................................................................ 7
      A.    What follows is a brief summary of the dates and circumstances that
            led the Debtor to file its bankruptcy ................................. 7
            1.    The Debtor's Business ......................................... 7
            2.    Events Leading to Chapter 11 Filing............................ 14
      B.    Events Occurring After Bankruptcy Filing .......................... 14
            1.    Turnover of the Properties..................................... 14
            2.    Cash Collateral .............................................. 15
III.  SUMMARY OF THE PLAN ..................................................... 16
      A.    Introduction...................................................... 16
      B.    Summary of Treatment of Secured Claims of Hanmi Bank............... 16
      C.    Summary of Treatment of Claims of Individual Lenders............... 19
IV.   CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER
      THE PLAN.................................................................. 19
      A.    What Creditors and Interest Holders Will Receive Under The Plan ......... 19
      B.    Unclassified Claims .............................................. 20
            1.    Administrative Expenses ...................................... 20
            2.    Priority Tax Claims .......................................... 21
      C.    Classified Claims and Interests ................................... 23
            1.    Class of Secured Claims ...................................... 23
            2.    Classes of Priority Unsecured Claims .......................... 30
            3.    Class of General Unsecured Claims ............................ 31
            4.    Class of Interest Holders ..................................... 31
      D.    Means of Effectuating the Plan ................................... 31
            1.    Funding for the Plan .......................................... 31
            2.    Disbursing Agent ............................................. 32
            3.    Objections to Claims ......................................... 32
            4.    Interest Pending Allowance of Claims .......................... 33
            5.    Distributions to be Made Pursuant to the Plan ................. 3 4
            6.    Exculpations and Releases .................................... 35
            7.    Injunctions .................................................. 35
      E.    Risk Factors ..................................................... 36
      F.    Other Provisions of the Plan ..................................... 37
            1.    Executory Contracts and Unexpired Leases ...................... 37
                  a)    Assumptions ............................................ 37

i

|  |  |  |  | (i) | Schedule of Assumed Agreements ……………… | 37 |
|  |  |  |  | (ii) | Cure Payments ……………………………… | 37 |
|  |  |  |  | (iii) | Objections to Assumption or Proposed Cur7 Payments …………………………………….. | 37 |
|  |  |  | b) | | Rejections ……………………………………… | 38 |
|  |  | 2. | | | Retention of Jurisdiction ……………………………… | 39 |
|  | G. | | | | Tax Consequences of Plan ……………………………… | 40 |
| V. | | | | | CONFIRMATION REQUIREMENTS AND PROCEDURES …………………… | 41 |
|  | A. | | | | Who May Vote or Object ……………………………… | 42 |
|  |  | 1. | | | Who May Object to Confirmation of the Plan …………………… | 42 |
|  |  | 2. | | | Who May Vote to Accept/Reject the Plan …………………… | 42 |
|  |  |  | a) | | What Is an Allowed Claim/Interest ………………….. | 42 |
|  |  |  | b) | | What Is an Impaired Claim/Interest ………………….. | 43 |
|  |  | 3. | | | Who is Not Entitled to Vote ……………………………… | 43 |
|  |  | 4. | | | Who Can Vote in More Than One Class …………………… | 44 |
|  |  | 5. | | | Votes Necessary to Confirm the Plan ………………………. | 44 |
|  |  | 6. | | | Votes Necessary for a Class to Accept the Plan …………………… | 44 |
|  |  | 7. | | | Treatment of Nonaccepting Classes ……………………… | 45 |
|  |  | 8. | | | Request for Confirmation Despite Nonacceptance by Impaired Class(es) ……………………………………… | 45 |
|  | B. | | | | Liquidation Analysis …………………………………… | 45 |
|  | C. | | | | Feasibility ……………………………………………… | 47 |
| VI. | | | | | EFFECT OF CONFIRMATION OF PLAN ………………………………… | 48 |
|  | A. | | | | No Discharge……………………………………………… | 48 |
|  | B. | | | | Revesting of Property in the Reorganized Debtor ………………… | 49 |
|  | C. | | | | Modification of Plan……………………………………… | 49 |
|  | D. | | | | Post-Confirmation Status Report…………………………… | 49 |
|  | E. | | | | Quarterly Fees……….. …………………………………… | 50 |
|  | F. | | | | Post-Confirmation Conversion/Dismissal ……………………… | 50 |
|  | G. | | | | Final Decree …………………………………………… | 50 |
|  | | | | | DECLARATION OF TEMIDAYO AKINYEMI.. ……………… …………………... | 52 |

# I. INTRODUCTION

TEMIDAYO AKINYEMI, an individual, is the debtor and debtor-in-possession

("Debtor") in the above-captioned chapter 11 bankruptcy case ("Case").  On April 3, 2009

("Petition Date"), the Debtor commenced the Case by filing a voluntary Chapter 11 petition

under the United States Bankruptcy Code ("Bankruptcy Code"), 11 U.S.C. § 101 et seq.  Chapter

11 allows the Debtor, the creditors and other parties in interest to propose a plan of

reorganization.  A plan of reorganization may provide for the Debtor to reorganize by continuing

to operate, to liquidate by selling assets of the estate, or a combination of both.  The Debtor is the

party proposing the Chapter 11 Plan of Reorganization ("Plan") sent to you in the same envelope

as this document.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE

STATEMENT ("Disclosure Statement") FOR THE PLAN.

This is a reorganizing Plan.  Under the Plan, the Debtor will restructure the secured debts

against his three (3) rental properties and make payments to creditors from his post confirmation

income and the cash flow from the rental properties.  The effective date of the Plan ("Effective

Date") will be the first business day which is at least 11 days following the date of entry of the

Bankruptcy Court order confirming the Plan ("Plan Confirmation Order"), providing there has

been no order entered staying the effectiveness of the Plan Confirmation Order.  If there has been

an order entered staying the effectiveness of the Plan Confirmation Order, the Effective Date

shall be the first business day after the stay is no longer in effect with respect to the Plan

Confirmation Order.  The Debtor, following the Effective Date, will be referred to herein as the

"Reorganized Debtor".

As stated above, this Chapter 11 case involves three (3) rental properties. The properties are the primary assets of the estate. Each of the properties has a first and second mortgage and is greatly over encumbered.

At the time this case was filed, the Debtor was behind in his payments to all of the senior lienholders. If the Debtor had not filed for chapter 11 relief, the first mortgage holders on each property would have foreclosed on its real property collateral, thereby completely wiping out the second trust deed holders and eliminating any recovery for them or the general unsecured creditors.

The Plan generally divides creditors into two groups—secured creditors and unsecured creditors. The secured creditors are those creditors who hold first position trust deeds on the properties. These creditors are provided in the Plan with secured claims equal to the value of the real property collateral to which their deeds of trust attach. Their allowed secured claims are paid in full under the Plan. They are also entitled to elect treatment of their claims under section 1111(b) of the Bankruptcy Code, which is explained in detail below in the sections discussing treatment of specific secured claims.

The unsecured creditors consist generally of the creditors who hold second position trust deeds on the properties, trade creditors and credit card debt. The second trust deed holders are deemed unsecured creditors under the Bankruptcy Code because there is not collateral to which their lien may attach. In other words, they are entirely undersecured. Their liens shall be stripped from the property upon confirmation of the Plan. Further, only those junior lienholders and other unsecured creditors with allowed claims will participate in the distribution to unsecured creditors provided for in the Plan. If the Plan is confirmed, these creditors will receive seventeen percent (17%) of allowed general unsecured claims.  IF THE PLAN IS NOT APPROVED, AND

3

DEBTOR IS REQUIRED TO CONVERT HIS CASE TO CHAPTER 7, THE DEBTOR

BELIEVES THAT THE UNSECURED CREDITORS (THE SECOND TRUST DEED

HOLDERS AND DEBTOR'S OTHER UNSECURED CREDITORS) WILL RECEIVE

NOTHING IN RESPECT OF THEIR CLAIMS.


**A.    Purpose of This Document**

This Disclosure Statement summarizes what is in the Plan, and tells you certain

information relating to the Plan and the process the Court follows in determining whether or not

to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

**KNOW ABOUT:**

**(1)    WHO CAN VOTE OR OBJECT,**

**(2)    WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim**

**will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO**

**WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,**

**(3)    THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS**

**DURING THE BANKRUPTCY,**

**(4)    WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER**

**OR NOT TO CONFIRM THE PLAN,**

**(5)    WHAT IS THE EFFECT OF CONFIRMATION, AND**

**(6)    WHETHER THE PLAN IS FEASIBLE.**

4

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as this Disclosure Statement. If there are any inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court ("Court") has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan.

**B.      Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

**1.      Time and Place of the Confirmation Hearing**

The hearing where the Court will determine whether or not to confirm the Plan will take place on _____, 2009 at __:_0_.m. in Courtroom 1639, located at 255 East Temple St., Los Angeles, California 90012.

**2.      Deadline For Voting For or Against the Plan**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to Summer Saad, Esq., of Weintraub & Selth,

5

APC, 12121 Wilshire Blvd., Los Angeles, CA 90025. Your ballot must be received by 5:00 p.m.

PST, on _____, 2009, or it will not be counted.

### 3.   Deadline For Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Court and served upon

counsel for the Debtor at the address listed in the upper left-hand corner of the first page of this

Disclosure Statement by _____, 2009.

### 4.   Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact Summer

Saad, Esq., of Weintraub & Selth, APC, 12121 Wilshire Blvd., Suite 1300, Los Angeles,

California 90025, Telephone: (310) 207-1494.


## C.   Disclaimer

The financial data relied upon in formulating the Plan is based on the Debtor's books and

records which, unless otherwise indicated, are unaudited. The information contained in this

Disclosure Statement is provided solely by the Debtor. The Debtor represents that everything

stated in this Disclosure Statement is true and correct to the Debtor's best knowledge. The Court

has not yet determined whether or not the Plan is confirmable and makes no recommendation as

to whether or not you should support or oppose the Plan.

///

///

///

///

///

## II. BACKGROUND

**A.    What follows is a brief summary of the dates and circumstances that led the Debtor to file its bankruptcy.**

### 1.    The Debtor's Business.

The Debtor, an individual, commenced his bankruptcy case by filing a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* ("Bankruptcy Code") on April 3, 2009. The Debtor is operating his business and managing his financial affairs as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is a real estate developer. His primary source of income are the rents collected from properties he has developed, which include single family homes and multi-unit apartment buildings.

The primary assets of the chapter 11 estate consist of the following real properties:

(a)    a 3-unit apartment building located at 1615 Delta St., Los Angeles, CA ("1615 Delta");

(b)    a 2-unit apartment building located at 3320 and 3322 Bellevue Ave., Los Angeles, CA ("Bellevue");

(c)    a single family residence located at 4240 Palmero Dr., Los Angeles, CA ("Palmero");

(d)    a single family residence located at 2021 Park Dr., Los Angeles, CA ("Park"); and

(e)    a condominium located at 4411 Los Feliz Blvd., #404, Los Angeles, CA ("Los Feliz"). The first positioned secured lender has obtained relief from stay and is expected to foreclose on the property at any moment.

7

The Debtor also holds a 100% interest in Western Regional Properties, LLC ("WRP"). WRP is a Delaware limited liability company, registered to do business in California. It owns a sixteen (16) unit apartment building in Los Angeles, California.

**1615 Delta**

a.    Status and Cash Flow

Presently only one of three units of 1615 Delta is rented. The two vacant units require renovation. The estimated cost of construction is approximately $45,000.00. The time to complete construction is approximately 10 weeks.

The rented unit currently generates approximately $1,650.00 per month in rental income. After payment of maintenance expenses, insurance and property taxes, the property generates a net monthly income of approximately $800.00 which can be used for Plan payments, including debt service on the property and other Plan payments. The Plan proposes to strip liens down to the property's current value and pay the secured claim in a manner that makes this property self-sustaining. Following their renovation, the two other units will generate approximately an additional $3,500 in monthly rental income, with only a modest increase in expenses. The Plan also proposes to commence payments to certain creditors in the sixth full month following the Effective Date in order to enable Debtor to build a reserve with which he can complete the necessary renovations so that the income generated from this property can be maximized. Debtor estimates that during the first six months of the Plan he will build a reserve of approximately $70,000. This will be sufficient to complete renovations on this property and provide additional reserves to cover other Plan payments in the event of vacancies in other properties.

b.    Encumberances and Valuation

Following a hearing on notice to creditors, the Court determined that 1615 Delta has a current fair market value of $160,000.00.

1615 Delta is encumbered by a first deed of trust in favor of Metrocities Mortgage, LLC ("Metrocities"). A true and correct copy of the deed of trust is attached hereto as **Exhibit A**. The approximate amount of principal and interest currently outstanding on the note held by Metrocities is $541,637.39.

1615 Delta is also encumbered by a second deed of trust in favor of Metrocities. Since the balance on the first trust on this property exceeds the value of the property, the Metrocities second trust deed claim is entirely unsecured and is deemed a Class 8 (but only if and to the extent allowed) general unsecured claim under the Plan. Upon confirmation of the Plan, the Metrocities second trust deed, identified as document number 06 0002569, filed in the Official Records of the Los Angeles County Recorder, shall be stripped from 1615 Delta. A true and correct copy of the deed of trust is attached hereto as **Exhibit B**.

**Bellevue**

a.    Status and Cash Flow

Bellevue is rented and generates approximately $3,475.00 per month in rental income. After payment of maintenance expenses, insurance and property taxes, this property generates net monthly income of approximately $2,850.00 which can be used for Plan payments, including: debt service on the property and other Plan payments. The Plan proposes to strip liens down to the property's current value and pay the secured claim in a manner that makes this property self-sustaining.

9

b.    Encumberances and Valuation

Following a hearing on notice to creditors, the Court determined that Bellevue has a current fair market value of $375,000.00.

Bellevue is encumbered by a first deed of trust in favor of Metrocities.  True and correct copies of the note and deed of trust are attached hereto as **Exhibit C**.  The approximate amount of principal and interest currently outstanding on the note held by Metrocities is $501,464.99.

Bellevue is also encumbered by a second deed of trust in favor of Washington Mutual Bank, now J.P. Morgan Chase Bank, N.A. ("WaMu").  Since the balance on the first trust on this property exceeds the value of the property the Metrocities second trust deed claim is entirely unsecured and this claim is deemed a Class 8 claim (but only if and to the extent allowed) under the Plan.  Upon confirmation of the Plan, the WaMu second trust deed, identified as document number 20071347393, filed in the Official Records of the Los Angeles County Recorder, shall be stripped from Bellevue.  A true and correct copy of the deed of trust is attached hereto as **Exhibit D**.

**Palmero**

a.    Status and Cash Flow

Palmero is rented and generates approximately $3,150.00 per month in rental income. After payment of maintenance expenses, insurance and property taxes, this property generates net monthly income of approximately $2,500.00 which can be used for Plan payments, including:  debt service on the property and other Plan payments.  The Plan proposes to strip liens down to the property's current value and pay secured claims in a manner that makes this property self-sustaining.

a.      Status and Cash Flow

At a hearing on Debtor's Motion to Value the property, Debtor stipulated with the second trust deed holder that the property had a value no greater than that which would yield  a $15,000 secured claim in favor of the second trust deed holder.

Palmero is encumbered by a first deed of trust in favor of Astoria Federal Mortgage Corp. ("Astoria").  A true and correct copy of the deed of trust is attached hereto as **Exhibit E**.  The approximate amount of principal and interest currently outstanding on the note held by Astoria is $582,403.48.

Palmero is also encumbered by a second deed of trust in favor of Los Angeles Schools Federal Credit Union ("Schools").  A true and correct copy of the deed of trust is attached hereto as **Exhibit F**.  The approximate amount of principal and interest currently outstanding on the note held by Schools is $301,046.00.  Pursuant to stipulation, Schools and Debtor have agreed that Schools shall have a secured claim in the amount of $15,000 and a general unsecured claim (Class 8 under the Plan) in the amount of $285,516.21

### Park

a.      Status and Cash Flow

Park is Debtor's primary residence and accordingly, at this time, the Park property generates no cash flow.  Debtor is analyzing the costs and benefits of moving out of his residence to a smaller, less expensive location so that Park can be used as a rental property.  Debtor is currently analyzing whether this change will provide a net benefit to the estate.

a.      Status and Cash Flow

1    Following a hearing on notice to creditors, the Court determined that Park has a current

2    fair market value of $600,000.00.

3

4    Park is encumbered by a first deed of trust in favor of Metrocities. A true and correct

5    copy of the deed of trust is attached hereto as **Exhibit G**. The approximate amount of principal

6    and interest currently outstanding on the note held by Metrocities is $737,551.89.

7    Park is also encumbered by a second deed of trust in favor of WaMu. Since the balance

8    on the first deed of trust on this property exceeds the value of the property, the WaMu claim is

9    entirely unsecured and the WaMu claim is deemed a Class 8 claim (but only if and to the extent

10   allowed) under the Plan. Upon confirmation of the Plan, the WaMu second trust deed, identified

11   as document number 20071233536, filed in the Official Records of the Los Angeles County

12   Recorder, shall be stripped from Park. A true and correct copy of the deed of trust is attached

13   hereto as **Exhibit H**.

14

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27

28

**Los Feliz**

a.    Status and Cash Flow

Los Feliz is rented and generates approximately $1,600.00 per month in rental income.

b.    Encumberances and Valuation

Los Feliz is encumbered by a first deed of trust in favor of Chase Home Finance, LLC. A true and correct copy of the deed of trust is attached hereto as **Exhibit I**. The approximate amount of principal and interest currently outstanding on the note held by Chase is $436,792.48.

Los Feliz is also encumbered by a second deed of trust in favor of WaMu. Upon confirmation of the Plan (if this asset remains property of the estate), the WaMu second trust deed, identified as document number 20070977448, filed in the Official Records of the Los Angeles County Recorder, shall be stripped from Los Feliz. A true and correct copy of the deed of trust is attached hereto as **Exhibit J**.

Following a hearing on notice to creditors, the Court determined that Los Feliz has a current fair market value of $350,000.00.

Chase obtained relief from the automatic stay and is expected to foreclose. Therefore, Debtor has not included the income or expenses relating to this property in the Plan or feasibility analysis.

**Western Regional Properties, LLC**

Debtor is the owner of 100% of the equity in Western Regional Properties, LLC ("WRP"), a Delaware limited liability company registered to do business in California. WRP owns a 16-unit apartment building located at 1616 Delta St., Los Angeles, CA ("1616 Delta") that is not part of the bankruptcy estate. 1616 Delta is rented and generates approximately

13

$23,425.00 per month in rental income. After payment of the mortgage, maintenance expenses, insurance and property taxes, this property generates net monthly income of approximately $11,550.00. All of the net monthly income is available to be used for Plan payments.

### 2. Events Leading to Chapter 11 Filing

In 2008, Debtor commenced the renovation of 1616 Delta. This construction project experienced construction delays, which resulted in additional holding costs and increased debt service on the project. Debtor eventually finished the project, but with declining property values, Debtor was unable to sell or refinance the property as he had anticipated, which would have allowed him to meet his debt obligations. The construction project delay regarding 1616 Delta drained Debtor's savings and caused him to default on debt service obligations to the lienholders on his properties.

The damage to the Debtor's financial affairs inflicted by the construction delays of 1616 Delta was compounded by the collapse of the capital markets in the United States and the real estate market in Southern California. As a result of these events, the Debtor could not sell or refinance any of his properties once cash flow became constricted and savings were exhausted. The Debtor filed for chapter 11 bankruptcy relief on April 3, 2009, in order to reorganize his financial affairs.

### B. Events Occurring After Bankruptcy Filing.

#### 1. Employment of Professionals

At the inception of the Case, Debtor retained Jerome S. Cohen ("Cohen") as his general bankruptcy counsel. Thereafter, Debtor became dissatisfied with the advice and services provided by Cohen and decided to retain Weintraub & Selth, APC ("WS"), to replace Cohen.

14

On October 2, 2009, the Court entered an order authorizing the Debtor to employ WS as his general bankruptcy counsel to assist in the administration of the Case and reorganization of the Debtor's business affairs.

On May 27, 2009, the Court entered an order authorizing Debtor to employ Mark A. Hearn ("Hearn") as his appraiser. Debtor retained Hearn to appraise the properties of the estate discussed above.

At a hearing held on October 30, 2009, the Court authorized Debtor to employ Bette Hiramatsu of Hiramatsu & Associates as his financial and reorganization consultant. Hiramatsu & Associates is a management consulting firm dedicated to assisting small businesses facing financial and operational challenges in resolving their problems.

### 2.    Cash Collateral

On October 30, 2009, the Court granted the Debtor's motion for authority to use cash collateral throughout the pendency of the case to pay the taxes and insurance with respect to the 1615 Delta; Los Feliz; and Bellevue properties which are the only properties with cash collateral issues.

///

///

///

///

///

///

///

15

# III.

# SUMMARY OF THE PLAN

## A.    Introduction.

It is important that creditors know that pursuant to this reorganization effort and Debtor's Chapter 11 Plan, unsecured creditors will receive payments equal to seventeen percent (17%) of their claims.  In contrast, **if the Plan is not approved, <u>unsecured creditors and the junior lienholders will likely receive nothing because the senior lienholders will be allowed to foreclose</u>.**  The current fair market values (as established by the Court) of 1615 Delta, Los Feliz, Palmero, Bellevue, and Park (collectively, the "Properties") are exceeded by the claims of the senior lienholders of each property, thereby resulting in the senior lienholders being undersecured and the junior lienholders being wholly unsecured.  Only junior lienholders who have allowed claims will participate in the Plan.

Under the Plan, the Debtor will contribute his post confirmation income sufficient to pay the allowed claims of junior lienholders and his unsecured creditors a distribution equal to 17% of their allowed claims.  The Plan will also restructure the senior obligations on all properties by recapitalizing arrearage, reducing the secured amount to reflect current value, and if necessary, reducing the interest rates on these obligations to current market conditions.  This restructure will increase net cash flow and allow Debtor to pay additional amounts to creditors.

## B.    Summary of Treatment of Senior Lienholders

Based on the Court determined value of the Properties, all senior lienholders are undersecured.  The Plan bifurcates the senior lienholders' claims into secured and unsecured claims (with the exception of the senior lien on Park which is Debtor's primary residence and not

16

subject to bifurcation). Specifically, the Plan provides each senior lienholder with a secured claim in the amount of the Court determined value of the property securing such claim and an unsecured claim for the balance. Accordingly, these senior lienholders shall receive two distributions: one pursuant to its secured claim, and one pursuant to its general unsecured claim. Furthermore, the senior lienholders shall have the right to vote both in the secured creditor class of claims and in the general unsecured creditor class of claims. However, senior lienholders may elect different treatment as described below.

Senior lienholders have the right to make an "1111(b) election." This election is premised on Bankruptcy Code section 1111(b)(2), which states that "[i]f such an election is made, then . . . such claim is a secured claim to the extent that such claim is allowed." 11 U.S.C. § 1111(b)(2). In other words, making the election indicates that the creditor elects to have both the unsecured and secured portions of its claim treated as a secured claim and to relinquish its right to vote on the plan as a general unsecured creditor and share in the distribution to general unsecured creditors. Making an 1111(b) election will result in the entire claim being paid at 0% interest as opposed to the interest rate proposed by the Plan for payment of the secured portion of the claim. This is because, irrespective of whether the creditor makes an 1111(b) election, the present value of the distribution to senior lienholders is equal to the value of the property securing their claim. Debtor proposes a Plan to bifurcate the secured portion of the claim (which is equal to the value of the collateral) from the unsecured portion of the claim. The Plan proposes to restructure each loan so as to pay the secured portion of the claim the highest interest rate feasible for that particular property, given the net income derived by the property. A certain monthly payment was reached when calculating those interest rates. If the creditor makes an 1111(b) election, the monthly installment payment will be the same. However, because the

monthly installment payment is reflective of present value, the creditor will not be paid any

interest on a restructured loan of an amount larger than present value of the property, as that

would exceed the payment to which the secured creditor is entitled. Many senior lienholders will

determine that it is in their best interest to decline to elect section 1111(b) so that they can earn

interest on the secured portion of their claim.

Furthermore, **if all senior lienholders make the 1111(b) election, the Case will very likely get converted to a Chapter 7 liquidation wherein all senior lienholders are likely to incur losses instead of receiving what the plan proposes**, e.g., earning interest on the secured

portion of their claims, and receiving payment on the unsecured portion of their claims consistent

with the proposed distribution to general unsecured creditors, as the Chapter 11 Plan of

Reorganization provides. **If a liquidation were to occur, the senior lienholders will almost certainly receive less than the secured portion of their claim, and will not earn any interest or receive any payment on the unsecured portion of the claim.**

**Finally, a liquidation will result in all junior lienholders and general unsecured creditors receiving no distribution at all.** Therefore, the Debtor urges senior lienholders to **decline** to make the 1111(b) election.

TO MAKE AN 1111(b) ELECTION, SENIOR LIENHOLDERS MUST FILE A

NOTICE OF INTENT TO ELECT 11 USC 1111(b) WITH THE COURT AND SERVE

DEBTOR'S COUNSEL BY MAILING SAME TO THE ATTENTION OF SUMMER SAAD,

ESQ., WEINTRAUB & SELTH, APC, 12121 WILSHIRE BLVD., SUITE 1300, LOS

ANGELES CALIFORNIA 90025 NO LATER THAN 5 BUSINESS DAYS PRIOR TO THE

DUE DATE FOR SUBMITTING BALLOTS. THE NOTICE MUST INDICATE THE CLASS

IT IS FILED ON BEHALF OF AND PROPERLY IDENTIFY THE PROPERTY TO WHICH

IT RELATES. ONLY THE HOLDER OF THE FIRST TRUST DEED OF EACH PROPERTY MAY FILE SUCH NOTICE.

**C.      Summary of Treatment of Junior Lienholders and Other General Unsecured Creditors**

Based on the Court determined values of the Properties, all junior lienholders are wholly unsecured. Accordingly, upon entry of an order confirming the Plan, the liens of all junior lienholders identified in **Exhibit P** attached hereto, shall be stripped from the properties they were recorded on and shall no longer be a lien or encumbrance on such property; and junior lienholders shall be treated as having a general unsecured claim along with the other general unsecured creditors. Only those junior lienholders who have allowed claims will receive a distribution under the Plan. Under the Plan, all general unsecured creditors holding allowed claims shall receive a distribution based on their general unsecured claim. In the event the Plan is not approved, the senior lienholder is likely to foreclose on the Properties resulting in no distributions to any other creditors.

**IV.      CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

**A.      What Creditors and Interest Holders Will Receive Under the Plan**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority. The Plan states whether each class of claims or interests is impaired or unimpaired. The Plan provides the treatment each class will receive.

19

**B.     Unclassified Claims**

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Debtor has not placed the following claims in a class:

**1.     Administrative Expenses**

Administrative expenses are claims for costs or expenses of administering the Case that are allowed under Bankruptcy Code Section 507(a)(1).  The Bankruptcy Code requires that all administrative claims be paid on the Effective Date unless a particular claimant agrees to a different treatment.

The following chart lists all of the Debtor's § 507(a)(1) administrative claims and their treatment under the Plan:

| Name | Amount Owed | Treatment |
| --- | --- | --- |
| Weintraub & Selth, APC, Debtor's bankruptcy counsel ("WS") | $60,000 (estimated) | Paid in full from cash on hand upon the later of (a) the Plan's Effective Date, or (b) the entry of an Order allowing the fees. |
| Jerome S. Cohen, Debtor's former bankruptcy counsel | $16,500.00 | This claimant is entitled to payment in full from cash on hand on the Plan's Effective Date but has agreed to accept installment payments of $3,000 per month commencing December 2009. |
| Hiramatsu & Associates, Debtor's financial consultant | $2,000 (estimated) | Paid in full from cash on hand upon the later of (a) the Plan's Effective Date, or (b) the entry of an Order allowing the fees. |
| Mark A. Hearn ("Hearn"), Debtor's appraiser | $0 | N/A.  Pursuant to employment application, Hearn has been paid from non-estate funds. |
| Clerk's Office Fees | $1,000 (estimated) | Paid in full upon the Effective Date. |
| Office of the U.S. Trustee Fees | $650.00 (estimated) | Paid in full upon the Effective Date. |
| **TOTAL** | $85,150 (estimated) | |

<u>Court Approval of Fees Required:</u>

The Court must rule on all fees listed in this chart before the fees will be owed, except for post-petition trade payables and fees owing to the Clerk's Office and U.S. Trustee or fees to be paid from non-Debtor sources or, if the Debtor waives the right to require the filing of fee applications, fees of professionals to be paid from proceeds from a sale or financing transaction in excess of the amount necessary to pay all claims against the Debtor (i.e., claims paid from equity). The professional in question must file and serve a properly noticed fee application, and the Court must rule on the application. Only the amount of fees allowed by the Court will be owed and required to be paid under the Plan. As discussed in this Disclosure Statement, the Debtor will have sufficient cash on hand on the Effective Date to satisfy the foregoing administrative claims.

### 2.    Priority Tax Claims

Priority tax claims are certain unsecured income, employment and other taxes described by Bankruptcy Code Section 507(a)(8). The Bankruptcy Code requires that each holder of such a Section 507(a)(8) priority tax claim receive the present value of such claim in deferred cash payments, over a period not exceeding six (6) years from the date of the assessment of such tax. The following chart identifies the Plan's treatment of the class of interest holders:

///

///

///

///

///

21

| Name | Priority Tax Claim Amount | Treatment |
|---|---|---|
| Priority claim of: Franchise Tax Board | $370.14 (per filed proof of claim) | Paid in full upon the Effective Date. |
| Priority claim of: L.A. County Treasurer and Tax Collector (1615 Delta property tax) | $7,918 (per Debtor's Schedule) | Pending the payment of the claim, this Class shall continue to retain its lien and shall accrue interest (including accrual of interest on the disputed portion of the claim) in accordance with 11 U.S.C. §§ 506(b) and 511.<br><br>The treatment described in the Plan shall be in full settlement and satisfaction of this allowed claim<br><br>Interest will accrue at 3% and Debtor will make monthly installment payments of $142.28 for 5 years, commencing April 1, 2010. |
| L.A. County Treasurer and Tax Collector (Los Feliz property tax) | $3,330.91 (per filed proof of claim) | The First Trust Deed Holder has obtained relief from the automatic stay.  This secured creditor will be paid amounts due it in the order of priority from the foreclosure proceeds and the claim will be extinguished.<br><br>The treatment described in the Plan shall be in full settlement and satisfaction of this allowed claim. |
| L.A. County Treasurer and Tax Collector (Palmero property tax) | $6,254.00 (per Debtor's Schedule) | Pending the payment of the claim, this Class shall continue to retain its lien and shall accrue interest (including accrual of interest on the disputed portion of the claim) in accordance with 11 U.S.C. §§ 506(b) and 511.<br><br>The treatment described in the Plan shall be in full settlement and satisfaction of this allowed claim.<br><br>Interest will accrue at 3% and Debtor will make monthly installment payments of $112.38 for 5 years, commencing April 1, 2010. |
| L.A. County Treasurer and Tax Collector (Park property tax) | $7,533 (per Debtor's Schedules) | Pending the payment of the claim, this Class shall continue to retain its lien and shall accrue interest (including accrual of interest on the disputed portion of the claim) in accordance with 11 U.S.C. §§ 506(b) and 511.<br><br>The treatment described in the Plan shall be in full settlement and satisfaction of this allowed claim.<br><br>Interest will accrue at 3% and Debtor will make monthly installment payments of $135.36 for 5 years, commencing April 1, 2010. |

C.    **Classified Claims and Interests**

1.    **Class of Secured Claims**

Secured claims are claims secured by liens on property of the estate. The following charts list the classes containing the Debtor's secured pre-petition claims and their treatment under the Plan:

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

**Claims Secured by Delta**

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 1 | Secured claim of: First Trust Deed Holder, Metrocities Mortgage, LLC<br><br>Collateral description = 1615 Delta<br><br>Claim Priority = 1st<br><br>Collateral value = $160,000<br><br>Total Amount of Claim = $541,637.39 (per Debtor's Schedule)<br><br>Secured Portion of Claim = $160,000<br><br>Unsecured Portion of Claim = $381,637.39<br><br>entitled to a second ballot in this amount and a 17% distribution per Class 8 to be used in a vote among the Class of General Unsecured Creditors if creditor does NOT elect Section 1111(b) | N | Y<br><br>(Creditor in this class is entitled to vote on the Plan) | Pending the payment of the secured portion of its claim, this Class shall continue to retain its lien and shall accrue interest (including accrual of interest on the disputed portion of the claim)<br><br>The treatment of the holder of the class 1 allowed claim described in the Plan shall be in full settlement and satisfaction of all class 1 allowed claims.<br><br>The secured claim will be paid in accordance with the interest rate set forth in the Note, which as of November 20, 2009 was 2.74%. It will be fixed at this rate for three years. Thereafter the interest rate will adjust every 6 months pursuant to the 6-month LIBOR index, subject to the Note's limits on interest changes. Debtor will make interest only payments on a monthly basis (approximately $388) for the first 5 years commencing the 1st day of the sixth full month following the Effective Date; with a balloon payment of the balance remaining due on July 1, 2015.<br><br>The unsecured portion of the claim will be paid as the Plan provides for general unsecured claims.<br><br>If Class 1 Elects Section 1111(b):<br>The total amount of claim will be paid but no interest will accrue. Class 1 will receive monthly installments of $388; with a balloon payment of the balance due in 30 years on July 1, 2040; and<br><br>Class 1 cannot vote in the class of general unsecured creditors or receive the 17% distribution afforded Class 8 claims |

If Class 1 does not elect 1111(b) treatment, it will accrue and receive interest during

the first 5 years and receive a balloon payment in the total amount of the Secured Portion of its

claim on July 1, 2015, plus a 17% distribution on the unsecured portion of its claim to be paid as

provided in Class 8.

      If Class 1 elects 1111(b), it will <u>not</u> accrue or receive any interest on its claim and

will not receive a balloon for 30 years (on July 1, 2040).  It will <u>not</u> receive any distribution per

Class 8 and will also loose its right to cast an extra ballot as a Class 8 member.

## Claims Secured by Los Feliz

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 2 | Secured claim of: First Trust Deed Holder, Metrocities Mortgage, LLC<br><br>Collateral description = Los Feliz<br><br>Claim Priority = 1st<br><br>Collateral value = $350,000<br><br>Total Amount of Claim = $436,792.48 (per filed claim)<br><br>Unsecured Portion of Claim: $86,792.48 | N | N<br><br>(Creditor in this class is not entitled to vote on the Plan) | The Class 2 creditor has obtained relief from the automatic stay.  This secured creditor will be paid amounts due it in the order of priority from the foreclosure proceeds and the claim will be extinguished.<br><br>The treatment of the holder the class 2 allowed claim described in the Plan shall be in full settlement and satisfaction of all class 2 allowed claims. |

**Claims Secured by Bellevue**

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 3 | Secured claim of: First Trust Deed Holder, Metrocities Mortgage, LLC<br><br>Collateral description = Bellevue<br><br>Claim Priority = 1st<br><br>Collateral value = $375,000<br><br>Total Amount of Claim = $501,464.99 (per filed claim)<br><br>Secured Portion of Claim = $375,000<br><br>Unsecured Portion of Claim: $126,464.99<br><br>entitled to a second ballot in this amount and a 17% distribution per Class 8 to be used in a vote among the Class of General Unsecured Creditors if creditor does NOT elect Section 1111(b) | N | Y<br><br>(Creditor in this class is entitled to vote on the Plan) | Pending the payment of the secured portion of its claim, this Class shall continue to retain its lien and shall accrue interest (including accrual of interest on the disputed portion of the claim)<br><br>The treatment of holder of class 3 allowed claim described in the Plan shall be in full settlement and satisfaction of all class 3 allowed claims.<br><br>The secured claim will be paid in accordance with the interest rate set forth in the Note, which as of November 20, 2009 was 2.74%. It will be fixed at this rate for three years. Thereafter, the interest rate will adjust every 6 months pursuant to the 6-month LIBOR index, subject to the Note's limits on interest changes. Debtor will make interest only payments on a monthly basis (approximately $871) for the first 5 years commencing the 1st day of the sixth full month following the Effective Date; with a balloon payment of the balance remaining due on July 1, 2015.<br><br>The unsecured portion of the claim will be paid as a general unsecured claim.<br><br>If Class 3 Elects Section 1111(b):<br>The total claim will be paid at 0% interest in monthly installments of $871 until the total amount of the claim is paid in full; and<br><br>Class 3 cannot vote in the class of general unsecured creditors or receive the 17% distribution afforded Class 8 claims. |

If Class 3 does not elect 1111(b) treatment, it will accrue and receive interest during

the first 5 years and receive a balloon payment in the total amount of the Secured Portion of its

claim on July 1, 2015, plus a 17% distribution on the unsecured portion of its claim to be paid as

provided in Class 8.

However, if Class 3 elects 1111(b) treatment, it will only receive the total amount of

its claim with <u>no</u> interest and will <u>not</u> receive any distribution as a Class 8 member.  It will also

loose its right to cast an extra ballot as a Class 8 member.

## Claims Secured by Palmero

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 4 | Secured claim of: Astoria Federal Mortgage Corp.  Collateral description = Palmero  Claim Priority = 1st  Collateral value = $597,403  Total Amount of Claim = $ 582,403.48 (per filed claim)  Secured Portion of Claim = $582,403.48  Unsecured Portion of Claim: $0 | N | Y  (Creditor in this class is entitled to vote on the Plan) | Pending the payment of the secured portion of its claim, this Class shall continue to retain its lien and shall accrue interest (including accrual of interest on the disputed portion of the claim)  The treatment of the holder of the class 4 allowed claim described in the Plan shall be in full settlement and satisfaction of all class 4 allowed claims.  The secured claim will be paid in accordance with the interest rate set forth in the Note, which as of November 20, 2009, was 3.53%. This interest rate will be fixed at 3.53% for a 30 year term.  Interest only payments will be made until December 2014 and fully amortized thereafter.  Interest-only monthly payments will be approximately $1,820 and will commence on the 1st day of the sixth full month following the Effective Date.  All arrears owing on the date monthly payments commence will be recapitalized and added to the principal balance of the loan.  If  Class 4 Elects Section 1111(b): N/A |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 5 | Secured claim of: Los Angeles Schools Federal Credit Union<br><br>Collateral description = Palmero<br><br>Claim Priority = 2nd<br><br>Collateral value = $597,403<br><br>Total Amount of Claim = $301,046<br><br>Secured Portion of Claim = $15,000<br><br>Unsecured Portion of Claim: $285,516.21<br><br>entitled to a second ballot in this amount and a 17% distribution per Class 8 to be used in a vote among the Class of General Unsecured Creditors | N | Y<br><br>(Creditor in this class is entitled to vote on the Plan) | Pending the payment of the secured portion of its claim, this Class shall continue to retain its lien and shall accrue interest (including accrual of interest on the disputed portion of the claim)<br><br>The treatment of the holder of the class 5 allowed claim described in the Plan shall be in full settlement and satisfaction of all Class 5 allowed claims.<br><br>The secured claim will be paid in accordance with the adjustable interest rate set forth in the note, which as of November 20, 2009, was 3.25%, fully amortized over 30 years, monthly payments will be approximately $69, and will commence on the 1st day of the sixth full month following the Effective Date.<br><br>The unsecured portion of the claim will be paid as a general unsecured claim.<br><br>If Class 4 Elects Section 1111(b): N/A waived pursuant to Stipulation |

///

///

///

///

///

///

///

///

///

///

///

**Claims Secured by Park**

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 6 | Secured claim of: First Trust Deed Holder, Metrocities Mortgage, LLC<br><br>Collateral description = Park<br><br>Claim Priority = 1st<br><br>Collateral value = $600,000<br><br>Amount of Claim = $ 737,551.89 (per filed claim)<br><br>Unsecured Portion of Claim =N/A – this is Debtor's primary residence not subject to bifurcation of claim | N | Y<br><br>(Creditor in this class is entitled to vote on the Plan) | Pending the payment of the secured portion of its claim, this Class shall continue to retain its lien and shall accrue interest (including accrual of interest on the disputed portion of the claim).<br><br>The treatment of the holder of the class 6 allowed claim described in the Plan shall be in full settlement and satisfaction of all class 6 allowed claims.<br><br>All arrears owing on the date monthly payments commence will be added to the principal balance of the loan and Debtor will continue to make the regular monthly payments under the loan in the amount of: $3,457, commencing April 1, 2010. |

Class 6 is secured by Debtor's primary residence and therefore cannot be modified.

Accordingly, no 1111(b) options are applicable.

///

///

///

///

///

///

///

///

///

**Claim Secured by Debtor's Vehicle:**

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
| 7 | Secured claim of: Musician's Interguild Credit Union <br><br> Collateral description = 2005 Lexus LS430 <br><br> Claim Priority = 1st <br><br> Collateral value = $25,000 <br><br> Amount of Claim = $ 24,511.94 (as of August 12, 2009, per Reaffirmation Agreement) | N | N <br><br> (Creditor in this class is not entitled to vote on the Plan) | Debtor has entered into a reaffirmation agreement with this creditor, which was approved by the Court in an Order entered October 2, 2009. Debtor will continue to pay this creditor pursuant to the reaffirmation agreement, installment payments in the amount of $485 per month. <br><br> Pending the payment of the secured portion of its claim, this Class shall continue to retain its lien and shall accrue interest (including accrual of interest on the disputed portion of the claim) <br><br> The treatment of holder of class 7 allowed claim described in the Plan shall be in full settlement and satisfaction of all class 7 allowed claims. |

### 2.   Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Bankruptcy Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Bankruptcy Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim. However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims. The Debtor is not aware of any claims that would qualify as Sections 507(a)(3), (a)(4), (a)(5), (a)(6), and (a)(7) priority unsecured claims under the Plan.

///

///

///

### 3.    Class of General Unsecured Claims

General unsecured claims are unsecured claims not entitled to priority under Bankruptcy

Code Section 507(a).  **Exhibit K** consists of a chart showing all unsecured claims against the

estate.  The following chart identifies the Plan's treatment of the classes containing <u>all</u> of the

Debtor's general unsecured claims:

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 8 | <u>Claims:</u><br>All General Unsecured Claims<br><br><u>Amount of all claims</u><br>Approximately $538,162.88 (per Schedule F undisputed claims plus filed claims)<br><br>Plus: $226,144.16 (wholly unsecured junior lien holders)<br><br>Plus $793,618.59 (unsecured portion of senior lien holder's claims<br><br>Total:  1,628,222.63 | N. | Y<br><br>Allowed claims in this class are entitled to vote on the Plan | Class 8 shall receive their pro-rata share of a 17% distribution to be paid over 3 years. The total amount distributed will be $277,000  The first installment of $7,698 will be made on the first day of the sixth full month following the Effective Date, and each month thereafter until $277,000 is paid in full.<br><br>The treatment of holder of class 8 allowed claim described in the Plan shall be in full settlement and satisfaction of all class 8 allowed claims. |

### D.    Means of Effectuating the Plan

### 1.    Funding for the Plan

The Plan will be funded by the Debtor's business operations, specifically rents collected

as a result of his ownership of the Properties and his employment.  Debtor will also contribute

funds from the income stream available to him from property which is not property of the estate,

but which is held by his company, WRP.  The total net income available for Plan payments from

these various sources is $19,825 per month.[1]  Also, during the pendency of this Chapter 11 case,

Debtor has not been making mortgage payments and has been saving and segregating the rental

income from the estate's rental of various real properties.  As of October 8, 2009, Debtor had

$35,000 cash on hand.  Debtor projects that on the Effective Date, Debtor will have $98,954

available for the payment of administrative expenses.  A Portion of Debtor's cash on hand is

cash collateral.  Upon confirmation of the Plan, cash collateral will be used to pay administrative

expenses.

### 2.    Disbursing Agent

Debtor will act as his own disbursing agent with the assistance of BMS, Inc., who will

provide "Trustworks" software and software support through a software licensing agreement

which will facilitate the calculation and distribution of the pro-rata share for each general

unsecured claimant.  BMS, Inc., is bonded.  The software licensing agreement will be at no cost

to Debtor but includes a stipulation that Debtor deposit the funds to be distributed with J.P.

Morgan Chase Bank, N.A. ("Chase").  Chase is also bonded.  BMS, Inc., will also cause the

payments to be mailed to each recipient at no extra cost, but will pass through the expense of

postage to Debtor.

### 3.    Objections to Claims

Pursuant to 11 U.S.C. § 502(a), any party in interest may assert objections to claims.

Objections to claims shall be served and filed no later than 90 days after the date of entry of

Order Confirming the Plan, or such later time as ordered by the Court.  Attached as **Exhibit L**

---

[1] In addition, Debtor receives $200 monthly residual payments for his work as a writer, but Plan funding and feasibility is not depending on this residual payment, but depends instead on the rental income described above.

hereto is a claims chart, which identifies all of the Debtor's scheduled claims, and all proofs of claim which have been filed[2] against the Debtor. As provided by Section 502(c) of the Bankruptcy Code, the Court may estimate any contingent or unliquidated disputed claim for purposes of confirmation of the Plan. The Court shall retain jurisdiction over the Debtor, the Reorganized Debtor and the Case to resolve such objections to claims following the confirmation of the Plan.

Nothing contained in the Plan shall constitute a waiver or release by the Debtor of any rights of setoff or recoupment, or of any defense, it may have with respect to any claim. The Disbursing Agent will withhold from property to be distributed under the Plan and will place in reserve a sufficient amount of cash to be distributed on account of claims that are disputed and have not been allowed as of the date of distribution to creditors ("Disputed Claims") of any particular class as if such claims were allowed in full.

### 4.    Interest Pending Allowance of Claims

Except as specifically provided for in the Plan, in the order confirming the Plan, or in some other order of the Court, interest shall not accrue on claims and no holder of a claim shall be entitled to interest accruing on or after the Petition Date on any claim. Nothing set forth herein shall limit or impair the accrual of interest provided for Class 1 through 7, secured claims, whose respective treatments are described above.

To the extent the Debtor or any other party in interest objects to the allowance of any claim, nothing in the Plan or herein shall be deemed to imply or create for the holders of any Disputed Claims any entitlement to receive interest upon the allowed amount of any such

---

[2] All filed claims are subject to objections by Debtor as set forth herein.

33

Disputed Claims as a result, *inter alia*, of the delay in payment of such claims, except as expressly stated in the treatment pursuant to the Plan.

### 5.    Distributions to be Made Pursuant to the Plan

Distributions to be made by the Reorganized Debtor on account of any claim shall be made as promptly as practicable.  Distributions to be made by the Disbursing Agent under the Plan shall be made by check drawn on a domestic bank or by wire transfer, at the sole election of the Disbursing Agent.

Except as otherwise agreed to by the Disbursing Agent in writing, distributions to be made to holders of allowed claims pursuant to the Plan may be delivered by regular mail, postage prepaid, to the address shown in the Debtor's schedules, as they may from time to time be amended in accordance with Bankruptcy Rule 1009, or, if a different address is stated in a proof of claim duly filed with the Court, to such address.

Checks issued by the Reorganized Debtor or the Disbursing Agent to pay allowed claims shall be null and void if not negotiated within 60 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Reorganized Debtor by the holder of the allowed claim to whom such check originally was issued, prior to the expiration of 120 days from the date of issuance of such check.  After such date, the claim shall be deemed disallowed and the monies otherwise payable on account of such claim shall revest in the Reorganized Debtor free and clear of all claims and interests.

In connection with the Plan and any instruments issued in connection therewith, the Reorganized Debtor shall comply with all applicable withholding and reporting requirements

34

imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

### 6.    Exculpations and Releases

To the maximum extent permitted by law, none of the Debtor, the estate, nor any of their employees, agents, representatives, or the professionals employed or retained by any of them, whether or not by Court order (each, a "Released Person"), shall have or incur liability to any person or entity for an act taken or omission made in good faith in connection with or related to the formulation of the Plan, the Disclosure Statement, or a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of the Plan, or the consummation and implementation of the Plan and the transactions contemplated therein.  Each Released Person shall in all respects be entitled to reasonably rely on the advice of counsel with respect to its duties and responsibilities under the Plan.

### 7.    Injunctions

The occurrence of the Effective Date after the entry of the Confirmation Order shall enjoin the prosecution, whether directly, derivatively or otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest released, discharged or terminated pursuant to the Plan.

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all entities that have held, currently hold or may hold a claim or other debt or liability that is discharged or an interest or other right of an equity security holder that is terminated pursuant to

the terms of the Plan are permanently enjoined from taking any of the following actions against

the Debtor, the estate, or their property on account of any such discharged claims, debts or

liabilities or terminated interests or rights: (i) commencing or continuing, in any manner or in

any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in

any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien

or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against

any debt, liability or obligation due to the Debtor; and (v) commencing or continuing any action

in any manner, in any place that does not comply with or is inconsistent with the provisions of

the Plan.

By accepting distribution pursuant to the Plan, each holder of an allowed claim or

allowed interest receiving distributions pursuant to the Plan will be deemed to have specifically

consented to the injunctions set forth in this section.


**E.    Risk Factors**

The primary risk of implementing the Plan would be a decrease in rental income resulting

from a tenant defaulting in its lease or moving from the premises. Debtor has accounted for this

risk and has structured his plan so as to leave a surplus of approximately $270 per month which

will increase to $3,769.84 per month after the 1615 Delta renovations are complete and the

completed units filled with tenants. The surplus is intended to create a reserve which can be used

in the event Debtor suffers a decrease in rental income or there is a delay in obtaining a cure

from or replacing the defaulting tenant. Debtor has also planned for these risks by proposing a

Plan which commences most payments in the sixth (6th) full month following the Effective Date,

which will result in a reserve of approximately $70,000 only sixty percent (60%) of which will

be needed to complete the 1615 Delta renovations, the remainder of which will be left as a reserve to ensure plan feasibility.

Debtor is also negotiating a loan modification on behalf of WRP in hopes of reducing expenses and increasing the net income from that source to further build the reserve.

**F.      Other Provisions of the Plan**

**1.      Executory Contracts and Unexpired Leases**

**a)      Assumptions**

**(i)      Schedule of Assumed Agreements.**

On the Effective Date, Reorganized Debtor will assume the executory contracts and unexpired leases identified in **Exhibit M.**  The Confirmation Order, subject to the occurrence of the Effective Date, will constitute a Court order approving the assumption, on the Effective Date, of the executory contracts and unexpired leases identified in **Exhibit M**.

**(ii)      Cure Payments.**

Debtor is not in default of any executory contract identified in **Exhibit M**.

**(iii)      Objections to Assumption or Proposed Cure Payments.**

Any person who is a party to an executory contract or unexpired lease that will be assumed under the Plan and who either contends that there exists a default requiring cure payments, or otherwise objects to the contemplated assumption <u>must</u> file with the Court and serve upon the Debtor and the Debtor's counsel a written statement, together with supporting declaration stating the basis for its objection and any supporting documentation for such objection.  Such statement, declaration and documentation must be filed and served not later than

37

10 days before the date of the Plan confirmation hearing. Any person who fails to timely file and serve such a statement and declaration will be deemed to have waived any and all objections to both the proposed assumption and the proposed cure amount in connection with such assumption.

The Disbursing Agent shall not be required to make any payment of any proposed or allowed cure amounts until that date which is 30 days after entry of a final order resolving any objection or other dispute regarding: (a) the proposed cure amount under the executory contract or unexpired lease which the Debtor seeks to assume; (b) whether the Debtor or Reorganized Debtor has provided adequate assurance of future performance under such executory contract or unexpired lease; or (c) any other matter pertaining to a proposed assumption, the dispute and approving the assumption.

### b)    Rejections

To the extent that an executory contract or unexpired lease is not assumed, as specified in **Exhibit M**, on the Effective Date, all such executory contracts and unexpired leases shall be deemed rejected. The Confirmation Order, subject to the occurrence of the Effective Date, shall constitute an Order approving the Debtor's rejection of all such executory contracts and unexpired leases.

THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF AN EXECUTORY CONTRACT OR UNEXPIRED LEASE WILL BE 30 DAYS AFTER DATE OF ENTRY OF THE CONFIRMATION ORDER. Any claim based on the rejection of an executory contract or unexpired lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

2.        **Retention of Jurisdiction**

After confirmation of the Plan and occurrence of the Effective Date, in addition to

jurisdiction which exists in any other court, the Bankruptcy Court will retain such jurisdiction as

is legally permissible including for the following purposes:

a.        To resolve any and all disputes regarding the operation and interpretation of

the Plan and the Confirmation Order;

b.        To determine the allowability, classification, or priority of claims and

interests upon objection by the Debtor, the Reorganized Debtor, or by other parties in interest

with standing to bring such objection or proceeding;

c.        To determine the extent, validity and priority of any lien asserted against

property of the Debtor or property of the Debtor's estate.

d.        To construe and take any action to enforce the Plan, the Confirmation

Order, and any other order of the Court, issue such orders as may be necessary for the

implementation, execution, performance, and consummation of the Plan, the Confirmation

Order, and all matters referred to in the Plan, the Confirmation Order, and to determine all

matters that may be pending before the Court in this case on or before the Effective Date with

respect to any person or entity related thereto;

e.        To determine (to the extent necessary) any and all applications for

allowance of compensation and reimbursement of expenses of professionals for the period on or

before the Effective Date;

f.        To determine any request for payment of administrative expenses;

g.      To determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted during the pendency of this case whether before, on, or after the Effective Date;

h.      To determine such other matters and for such other purposes as may be provided in the Confirmation Order.

i.      To modify the Plan under Section 1127 of the Bankruptcy Code in order to remedy any apparent defect or omission in the Plan or to reconcile any inconsistency in the Plan so as to carry out its intent and purpose;

j.      Except as otherwise provided in the Plan or the Confirmation Order, to issue injunctions to take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or the Confirmation Order, or the execution or implementation by any person or entity of the Plan or the Confirmation Order;

k.      To issue such orders in aid of consummation of the Plan or the Confirmation Order, notwithstanding any otherwise applicable nonbankruptcy law, with respect to any person or entity, to the fullest extent authorized by the Bankruptcy Code or Bankruptcy Rules; and

l.      To enter a final decree closing this Case.

**G.**    **Tax Consequences of Plan**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues

the Plan may present to the Debtor.  The Debtor CANNOT and DOES NOT represent that the

tax consequences contained below are the only tax consequences of the Plan because the Tax

Code embodies many complicated rules which make it difficult to state completely and

accurately all of the tax implications of any action.

The Debtor does not anticipate that confirmation of the Plan will have a significant or

material effect on its tax liability.  The Debtor makes no representations regarding the potential

tax consequences to creditors.

## V. CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN

SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON

CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following

discussion is intended solely for the purpose of alerting readers about basic confirmation issues,

which they may wish to consider, as well as certain deadlines for filing claims. The Debtor

CANNOT and DOES NOT represent that the discussion contained below is a complete summary

of the law on this topic.

Many requirements must be met before the Court can confirm the Plan.  Some of the

requirements include that the Plan must be proposed in good faith, acceptance of the Plan,

whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7

liquidation, and whether the Plan is feasible.  These requirements are not the only requirements

for confirmation.

**A.    Who May Vote or Object**

### 1.    Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan, but, as explained below, not everyone is entitled to vote to accept or reject the Plan.

### 2.    Who May Vote to Accept/Reject the Plan

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

#### a)    What Is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim. When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE was **September 1, 2009**, for non-governmental entities and October 3, 2009, for governmental entities. A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no

party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

### b)    What Is an Impaired Claim/Interest

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is impaired under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.

In this case, the Debtor believes that Classes 1, 3, 4, 5, 6 and 8 are impaired and entitled to vote to accept or reject the Plan. Parties who dispute the Debtor's characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Debtor has incorrectly characterized the class.

### 3.    Who is Not Entitled to Vote

The following four types of claims are not entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(1), (a)(2), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF

THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE

CONFIRMATION OF THE PLAN.

### 4.    Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an

unsecured claim is entitled to accept or reject the Plan in both capacities by casting one ballot for

the secured part of the claim and another ballot for the unsecured claim.

### 5.    Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one

impaired class has accepted the Plan without counting the votes of any insiders within that class,

and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be

confirmed by "cramdown" on non-accepting classes, as discussed below.

### 6.    Votes Necessary for a Class to Accept the Plan

A class of claims is considered to have accepted the Plan when more than one-half (1/2)

in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted, voted

in favor of the Plan.  A class of interests is considered to have accepted the Plan when at least

two-thirds (2/3) in amount of the interest-holders of such class which actually voted, voted to

accept the Plan.

44

### 7.    Treatment of Nonaccepting Classes

As noted above, even if all impaired classes do not accept the Plan, the Court may

nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by

the Bankruptcy Code.  The process by which nonaccepting classes are forced to be bound by the

terms of the Plan is commonly referred to as "cramdown."  The Bankruptcy Code allows the

Plan to be "crammed down" on nonaccepting classes of claims or interests if it meets all

consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not

"discriminate unfairly" and is "fair and equitable" towards each impaired class that has not voted

to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

### 8.    Request for Confirmation Despite Nonacceptance by Impaired Class(es)

The Debtor will request cramdown on any impaired classes who do not vote to accept the

Plan.

### B.    Liquidation Analysis

Another confirmation requirement is the "Best Interest Test", which requires a liquidation

analysis.  Under the Best Interest Test, if a claimant or interest holder is in an impaired class and

that claimant or interest holder does not vote to accept the Plan, then that claimant or interest

holder must receive or retain under the Plan property of a value not less than the amount that

such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the

Bankruptcy Code.

The fair market value of all of Debtors' real property is less than the amount of the

secured claim of the First Trust Deed Holder of each property.  If liquidation were to occur,

general unsecured creditors would not receive anything and even first trust deed holders would receive less than the total amount of their claims and possibly even less than the secured portion of their claims.  However, Debtor's plan proposes to restructure the debt and pay down the value of each property with interest over time.  Debtor's plan also proposes to pay general unsecured creditors a 17% distribution.

The Debtor therefore believes that unsecured creditors will undoubtedly receive more under the Plan than they would receive in a Chapter 7 liquidation of the Debtor.  Below is a demonstration, in balance sheet format, that all creditors and interest holders will receive at least as much under the Plan as such creditor would receive under a Chapter 7 liquidation:

|  | **Chapter 7** | **Chapter 11** |
|---|---|---|
| Value of Assets: | $1,660,000.00[3] | Same |
| Administrative Claims | Appx. $85,150 | Same |
| Secured Claims | $2,409,274.69[4] | The same or less depending on which claim treatment senior liendholders choose |
| Priority Unsecured Claims | $370.14 | Same |
| Office of the United States Trustee | $650.00 | Same |
| Chapter 7 Trustee Fee | $76,050 | $0 |
| **TOTAL AVAILABLE FOR DISTRIUBTION TO GENERAL UNSECURED CREDITORS** | **$0** | Plan of Reorganization proposes to distribute a total of $277,000 Over 3 years, **yielding a 17% payback** to general unsecured creditors |

[3] This figure excludes Debtor's personal property totaling $57,954 which is subject to exemptions in a Chapter 7 liquidation.  It also excludes Debtor's Los Feliz property worth $350,000 because the First Trust Deed Holder has obtained relief from the automatic stay and is expected to foreclose on the property.  Even if these assets were available, general unsecured creditors would still receive a distribution of $0 in a Chapter 7 liquidation.

[4] This figure excludes Claims secured by the Los Feliz property which will be satisfied by the foreclosure Debtor anticipates as a result of the First Trust Deed Holder obtaining relief from the automatic stay.

1

2

## C.    Feasibility

3

Another requirement for confirmation involves the feasibility of the Plan, which means

4

that confirmation of the Plan is not likely to be followed by the liquidation, or the need for

5

further financial reorganization, of the Debtor or any successor to the Debtor under the Plan,

6

unless such liquidation or reorganization is proposed in the Plan.

7

There are at least two important aspects of a feasibility analysis.  The first aspect

8

considers whether the Debtor will have enough cash on hand on the Effective Date to pay all the

9

claims and expenses which are entitled to be paid on such date.  The Debtor maintains that this

10

aspect of feasibility is satisfied as the Debtor projects he will have between $98,954 cash on

11

hand, and administrative claims and priority claims total less than $86,000.

12

The second aspect considers whether the Debtor will have enough cash over the life of

13

14

the Plan to make the required Plan payments.  The Debtor will pay creditor claims from the

15

rental income obtained from the various properties of the estate plus an $11,550 contribution

16

from the income stream available to him from a rental property held by WRP, a corporation in

17

which Debtor has an ownership interest.

18

The Plan proposes to strip liens to each rental property's current value.  This renders each

19

20

rental property self-sustaining based on the current income derived from that property and the

21

current interest rate of each loan.  The interest rate proposed for each class of secured creditor is

22

the highest interest rate that each property can sustain under a feasible plan.  **The interest rate is**

23

**only applicable for secured creditors who DO NOT make the 1111(b) election.**  Secured

24

creditors who do make the election will instead receive a present value monthly installment

25

interest-free until the claim is paid in full.

26

27

28

Debtor's residence yields no income and therefore the $11,550 contribution from the non-estate property source and his post confirmation rental income will be used to sustain that property. Attached hereto as **Exhibit N** is a cash flow statement reflecting Debtor's current actual cash flow. Attached hereto as **Exhibit O** is a projected cash flow statement reflecting the cash flow Debtor expects upon completion of the renovations of 1615 Delta, which will result in the ability to increase the number of tenants at that property. Debtor's plan payments commence on the sixth full month following the Effective Date to enable Debtor to build a reserve sufficient for covering the cost of renovations. Debtor projects that during the first six months of the Plan, he will build a reserve of approximately $70,000.

Also, in an effort to develop and implement a feasible Plan, Debtor has reduced his living expenses from his pre-petition spending as it was reflected in Schedule J of the bankruptcy petition. He is also actively searching for a tenant to fill his primary residence in hopes to generate additional income with the intent of moving into a cheaper home to rent so that additional reserves can be built to ensure feasibility for the duration of the Plan.

## VI. EFFECT OF CONFIRMATION OF PLAN

**A.    Discharge**

The Debtor will receive a discharge under the Plan pursuant to and in accordance with the provisions of Section 1141 of the Bankruptcy Code.

**B.      Revesting of Property in the Reorganized Debtor**

Except as provided elsewhere in the Plan, the confirmation of the Plan revests all of the property of the estate in the Reorganized Debtor.  In addition, on the Effective Date, all of the claims against and/or interests in third parties that constitute property of the estate shall be revested in the Reorganized Debtor

**C.      Modification of Plan**

The Debtor may modify the Plan at any time before confirmation.  However, the Court may require a new disclosure statement and/or revoting on the Plan.

The Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated <u>and</u> (2) the Court authorizes the proposed modifications after notice and a hearing.

**D.      Post-Confirmation Status Report**

Within 120 days of the entry of the order confirming the Plan, the Debtor shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on the United States Trustee, the 20 largest unsecured creditors, and those parties who have requested special notice after the Effective Date. Further status reports shall be filed every 120 days and served on the same entities.

///

///

///

**E.      Quarterly Fees**

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) to date of confirmation shall be paid to the United States Trustee on or before the effective date of the plan.  Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the United States Trustee in accordance with 28 U.S.C. § 1930(a)(6) until entry of a final decree, or entry of an order of dismissal or conversion to chapter 7.


**F.      Post-Confirmation Conversion/Dismissal**

A creditor or party in interest may bring a motion to convert or dismiss the Case under § 1112(b) after the Plan is confirmed if there is a default in performing the Plan.  If the Court orders the Case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate.  The automatic stay will be reimposed upon the revested property, but only to the extent that the Court did not previously authorize relief from stay during the Case.

The order confirming the Plan may also be revoked under very limited circumstances. The Court may revoke the order if the order of confirmation was procured by fraud and if the party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the order of confirmation.

///

///

///

///

///

**G.     Final Decree**

     Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the

Debtor or other party as the Court shall designate in the order confirming the Plan, shall file a

motion with the Court to obtain a final decree to close the Case.

Dated: November 30, 2009                TEMIDAYO AKINYEMI., an individual

                                              Temidayo Akinyemi, debtor and debtor-in-
                                              possession

Presented By:

WEINTRAUB & SELTH, APC

By:
    Daniel J. Weintraub
    Summer Saad
    Attorneys for Chapter 11 Debtor and Plan Proponent

## DECLARATION OF TEMIDAYO AKINYEMI

I, Temidayo Akinyemi, hereby declare as follows:

1.    Unless otherwise set forth herein, I have personal knowledge of the facts set forth herein and, if called to testify, would and could competently testify thereto.

2.    I am the debtor and debtor in possession herein.

3.    I make this declaration in support of this disclosure statement ("Disclosure Statement") which describes the Debtor's Plan of Reorganization.

4.    To the best of my knowledge, information and belief, all of the information contained in this Disclosure Statement is truthful and accurate.

I declare and verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on this 30th day of November 2009, Los Angeles, California.


_____
TEMIDAYO AKINYEMI